## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, | Civil No. 12-690 (JRT/JJG) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| ARC MANUFACTURING, INC.; RONALD W. LAMMERT; VALERIOUS A. YOUNG, *as Co-Trustee for the Heirs and Next of Kin of James J. De Vaan*; MARY DE VAAN, *as Co-Trustee for the Heirs and Next of Kin of James J. De Vaan*; GREAT WEST MECHANICAL, INC. | |
| Defendants. | |

Matthew R. Smith, **TOMSCHE, SONNESYN & TOMSCHE, P.A.**, 610 Ottawa Avenue North, Minneapolis, MN  56303, for plaintiff.

Tonya T. Hinkemeyer, **RINKE NOONAN**, Post Office Box 1497, St. Cloud, MN  56302, for defendants ARC Manufacturing, Inc. and Ronald W. Lammert.

Thomas G. Johnson, **JOHNSON MOODY SCHMIDT & KLEINHUIZEN, PA**, 320 South First Street, Post Office Box 913, Willmar, MN  56201, for defendant Valerious A. Young.

Christopher A. Johnston, **JOHNSTON MARTINEAU PLLP**, 2233 North Hamline Avenue, Suite 550, Roseville, MN  55113, for defendant Mary De Vaan.

Matthew W. Moehrle, **RAJKOWSKI HANSMEIER LTD.**, Post Office Box 1433, St. Cloud, MN  56302, for defendant Great West Mechanical, Inc.

27

Plaintiff State Farm Fire and Casualty Company ("State Farm") brings this declaratory judgment action against its insureds, ARC Manufacturing, Inc. ("ARC"), Ronald Lammert, and Great West Mechanical, Inc. ("Great West"). The underlying facts giving rise to this action involve a fatal truck accident. James J. De Vaan was killed after a truck and trailer driven by Lammert collided with his vehicle. Lammert is the vice president of ARC, and at the time of the accident was returning home from a job site where ARC had been retained as a subcontractor by Great West to perform certain construction work. Valerious A. Young and Mary De Vaan as co-trustees for the heirs and next of kin of James J. De Vaan (collectively, "Co-Trustees") brought a wrongful death action in Minnesota state court against Lammert, ARC, and Great West.

State Farm then brought the present declaratory judgment action seeking a declaration that its contractor insurance policy issued to ARC does not provide coverage for damages arising out of the accident. Specifically, State Farm argues that coverage for the accident is barred by an exclusion in the policy for liability arising out of the use of a non-owned auto in ARC's business. State Farm moves for summary judgment with respect to all Defendants. Because the Court concludes that no issue of material fact remains such that a reasonable jury could find that the accident is covered under the policy, the Court will grant State Farm's motion for summary judgment.

## BACKGROUND

### I.   THE ABERDEEN JOB SITE

Lammert is the vice president of ARC, a company that performs plumbing, heating, ventilation, and air conditioning work.  (Aff. of Matthew R. Smith, Ex. 7 (Dep. of Ronald Walter Lammert ("Lammert Dep.") 8:9-20), July 19, 2013, Docket Nos. 29-31.)[1]  In October 2010, ARC was performing work for Great West as a subcontractor on a construction site in Aberdeen, South Dakota.  (Lammert Dep. 9:2-23; Smith Aff., Ex. 8 (Dep. of Scott Snare ("Snare Dep.") 17:23-18:2).)

On October 4, 2010, Lammert traveled to Great West's office facility in Big Lake, Minnesota, to pick up vent hoods to bring to the Aberdeen job site.  (Lammert Dep. 17:11-13, 36:21-25, 43:3-44:14.)  Lammert loaded the hoods onto a trailer ("the Trailer") attached to a 2007 Ford truck ("the Truck") and hauled the hoods to Aberdeen. (Lammert Dep. 11:9-10.)

No written agreement governed the relationship between ARC and Great West regarding ARC's work at the Aberdeen job site.  (Snare Dep. 36:9-14; Lammert Dep. 10:10-21.)  Great West paid an hourly rate for time Lammert spent driving the Truck and Trailer to and from the site.  (Snare Dep. 22:8-24.)  Great West also paid an hourly wage for Lammert's work on the site.  (*Id.* 23:6-15.)   Additionally, Great West paid approximately $800 per month for the use of the Truck.  (Lammert Dep. 49:13-51:23.)

---

[1] The Smith Affidavit is filed as Docket Number 29.  Exhibits 1 through 3 to the Smith Affidavit were filed separately at Docket Number 30 as a single, continuously paginated, document.   Exhibits 4 through 9 were filed separately at Docket Number 31 as a single, continuously paginated document.  In this Order, citations to page numbers in these exhibits, with the exception of depositions, refer to the CMECF pagination.

Snare testified that he was not sure, but assumed that Lammert did not receive compensation directly from Great West, but rather that Great West would have paid ARC, who in turn would have paid Lammert.  (Snare Dep. 7:9-11, 35:2-36:8, 48:13-19.) Lammert testified that he did not receive individual payments for any of the work performed at the Aberdeen jobsite and that Great West paid ARC.  (Lammert Dep. 18:6-20, 56:10-18.)  Great West did, however, pay Lammert individually $100 for using the Trailer to transport the hoods to the Aberdeen job site.  (Snare Dep. 41:15-23; Lammert Dep. 19:20-20:19.)

## II.    THE TRUCK AND TRAILER

Lammert was the registered owner of both the Truck and Trailer involved in the accident.  (Lammert Dep. 11:5-16, 17:19-18:5.)  ARC, however, purchased the Truck, making an $8,000 down payment and making all payments on the loans financing the Truck.  (*Id.* 23:11-14, Smith Aff., Ex. 6 at 35.)  ARC also paid for the Truck's license and registration fees, maintenance, fuel, and insurance.[2]   (Lammert Dep. 23:20-24:10.) Additionally, ARC depreciates the Truck and Trailer on its corporate tax returns.  (Smith Aff., Ex. 6 at 36.)  ARC also pays for the license and registration fees, maintenance, and insurance for the Trailer.  (Lammert Dep. 24:16-25:8.)  ARC makes these payments directly, rather than reimbursing Lammert for incurring such expenses.  (*Id.* 25:24-26:7.)

---

[2] The individual automobile insurance policy on the Truck that was in effect at the time of the accident was also purchased through State Farm.  (Lammert Dep. 12:3-13.)  That policy is not at issue in the present declaratory judgment action.

ARC made these payments because the company had determined that the Truck and Trailer are an integral part of its business.  (*Id.* 25:12-18; Smith Aff., Ex. 9.)

## III.   THE ACCIDENT

On October 7, 2010, Lammert was driving home from the Aberdeen job site in the Truck, pulling the Trailer behind him.   (Lammert Dep. 9:2-12.)   During this trip, Lammert collided with a vehicle driven by James De Vaan.  (Smith Aff., Ex. 2 at 55-58.) James De Vaan died as a result of the accident.  (*Id.*, Ex. 2 at 58.)  Lammert testified that when he was returning home from the Aberdeen job site he was driving in his "capacity as an employee of ARC."  (Lammert Dep. 27:18-22.)

## IV.   THE POLICY

The present dispute focuses on a contractor's insurance policy that ARC obtained from State Farm that was effective from February 4, 2010, through February 4, 2011. (Smith Aff., Ex. 1 at 2.)  ARC is the name insured on the Policy.  The Policy specifies that "[t]hroughout this policy, the words 'you' and 'your' refer to the Named Insured shown in the Declarations."  (*Id.*, Ex. 1 at 6.)[3]

Section II of the Policy is entitled "Designation of Insured" and contains a section "Who is an Insured."  (*Id.*, Ex. 1 at 30.)  This section defines who, other than ARC, is an insured, and provides that its "executive officers, directors and trustees" are also insureds

---

[3] The Policy provided to the Court is a renewal policy, and it does not appear to contain the declarations page referenced throughout the Policy.  Although ARC's name and address are listed on the renewal certificate, the renewal certificate does not specify that ARC is the named insured.   Because the parties do not dispute that ARC is the named insured listed on the declarations page, the absence of this page does not preclude the entry of summary judgment.

"but only with respect to their duties as . . . officers, director or trustees." (*Id.*) Additionally, the Policy provides that ARC's employees are insureds "but only for acts within the scope of their employment." (*Id.*)

The Policy provides comprehensive business liability insurance. (*Id.*, Ex. 1 at 23.) But this coverage contains an exclusion ("the Auto Exclusion") for "bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft, auto or watercraft owned or operated by or rented or loaned to any insured." (*Id.*, Ex. 1 at 24-25.) The exclusion does not apply, however to "bodily injury or property damage arising out of the use of any non-owned auto in your [ARC's] business by any person other than you [ARC]." (*Id.*, Ex. 1 at 25.) A non-owned auto is defined as "any auto [ARC] do[es] not own, lease, hire or borrow which is used in connection with [ARC's] business." (*Id.*, Ex. 1 at 34.)

Finally, with respect to coverage for Great West, the Policy contains an Additional Insured Endorsement ("the Endorsement"). (*Id.*, Ex. 1 at 39.) The Endorsement lists ARC as the named insured. (*Id.*) The Endorsement provides that "WHO IS AN INSURED, under SECTION II DESIGNATION OF INSURED, is amended to include as an insured the person or organization shown above, but only with respect to liability arising out of your work for that insured by or for you." (*Id.*) The only person or organization listed above on the Endorsement is "Greatwest Mechanical, Inc." (*Id.*)

## V.   PROCEDURAL HISTORY

In December 2012, the Co-Trustees brought a wrongful death action in Swift County, Minnesota, against Lammert, ARC, and Great West, on behalf of the heirs and next of kin of James De Vaan.  (Smith Aff., Ex. 2.)  The lawsuit alleged that Lammert was negligent in causing the accident, and was acting as an agent of and engaged in a joint venture with ARC and Great West at the time of the accident.  (*Id.*)

In March 2012, State Farm filed the present declaratory judgment action against ARC, Lammert, and the Co-Trustees.  (Compl., Mar. 19, 2012, Docket No. 1.)  When Great West was added as a defendant in the underlying state litigation, State Farm filed an amended complaint naming Great West as a defendant in this action as well.  (Am. Compl., Feb. 7, 2013, Docket No. 18.)

### ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986).   The interpretation of an insurance policy is a

matter of law which the Court can determine on summary judgment.   *See Iowa Kemper*

*Ins. Co. v. Stone*, 269 N.W.2d 885, 886-87 (Minn. 1978).

## II.     PRINCIPLES OF INSURANCE POLICY INTERPRETATION

The Court applies "general principles of contract interpretation" in determining

whether coverage exists.   *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249

(Minn. 1998).   The goal of insurance policy interpretation is to give effect to the parties'

intent.   *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704

(Minn. 2013).   The Court must construe the terms of the policy as a whole "according to

what a reasonable person in the position of the insured would have understood the words

to mean."   *Canadian Universal Ins. Co. v. Fire Watch, Inc.*, 258 N.W.2d 570, 572 (Minn.

1977).   Unambiguous language must be given its plain and ordinary meaning.   *Midwest*

*Family Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013).   A policy is

ambiguous if its language "is susceptible to two or more reasonable interpretations,"

*Carlson v. Allstate Ins. Co.*, 749 N.W.2d 41, 45 (Minn. 2008), and ambiguous language is

construed in favor of the insured, *see Prahm v. Rupp Constr. Co.*, 277 N.W.2d 389, 390

(Minn. 1979).   Whether an insurance policy is ambiguous is a question of law for the

Court.   *Columbia Heights Motors, Inc. v. Allstate Ins. Co.*, 275 N.W.2d 32, 34 (Minn.

1979).

Under Minnesota law the initial burden of establishing a prima facie case of

coverage rests with the insured.   *Midwest Family Mut. Ins. Co.*, 831 N.W.2d at 636.   If

the insured establishes coverage, the burden shifts to the insurer to prove that an exclusion applies. *Id.* Policy exclusions are "construed narrowly and strictly against the insurer." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006). It is also the insured's burden to prove that an exception to an exclusion which restores coverage applies. *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 314 (Minn. 1995), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919 (Minn. 2009).

### III.   COVERAGE FOR ARC AND LAMMERT

In order for ARC and Lammert to be entitled to coverage, a reasonable jury must be able to conclude based on the facts in the record that the Auto Exclusion does not apply to the circumstances of the accident. Specifically, coverage in this case turns on application of the exception to the Auto Exclusion. For ARC and Lammert to be covered under the Policy a reasonable jury therefore must be able to conclude that ARC did not own, lease, hire, or borrow the Truck.

As an initial matter, the parties agree that ARC is the named insured under the Policy. The parties also do not dispute that Lammert is an insured for purposes of the accident under the Policy's designation of who is an insured, either because the accident occurred during the scope of his duties as ARC's vice president, or because it occurred within the scope of his employment with ARC. *See Kaplan v. Alpha Epsilon Phi Sorority*, 42 N.W.2d 342, 345-46 (Minn. 1950) (holding that returning from a trip necessitated by an individual's employment falls within the scope of that employment).

Additionally, all parties agree that the Auto Exclusion, in isolation, would operate to bar

coverage in this case.  Specifically, the parties agree that Mr. De Vaan's death arose out

of the "ownership, maintenance, use or entrustment of any . . . auto."  (Smith Aff. Ex. 1 at

24-25.)  Furthermore, the parties agree that said auto, the Truck, was "owned or operated

by" Lammert – who qualifies as "any insured" under the Policy.  (*Id.*)

State Farm's summary judgment motion on coverage therefore involves only the

application of the exception to the Auto Exclusion, which provides that coverage **does**

exist for "bodily injury or property damage arising out of the use of any non-owned auto

in [ARC's] business by any person other than [ARC]."  (Smith Aff., Ex. 1 at 25.)  The

parties agree that certain elements of the exception have been satisfied.  Specifically,

State Farm concedes that the Truck was being used in ARC's business by Lammert, a

person "other than" ARC.  Consequently, the parties' dispute presents the very narrow

question of whether the Truck was a "non-owned auto" defined in the Policy as any auto

that ARC does not "own, lease, hire or borrow which is used in connection with ARC's

business." (*Id.*, Ex. 1 at 34.)  In support of its argument that the Policy does not provide

coverage, State Farm concedes that ARC did not own or lease the Truck, but contends

that ARC hired or borrowed the Truck from Lammert.  Consequently, State Farm argues

that the Truck does not meet the definition of a non-owned auto and therefore coverage

for the accident does not meet the criteria for the exception to the Auto Exclusion.

The terms "hire" and "borrow" are not defined in the Policy.  "When an insurer

fails to define a coverage term, it is not entitled to a strict or limited definition that differs

from the ordinary definition in order to avoid providing coverage."  *Kresse v. Home Ins.*

*Co.*, 765 F.2d 753, 755 (8ᵗʰ Cir. 1985); *see also Smith v. St. Paul Fire & Marine Ins. Co.*, 353 N.W.2d 130, 132 (Minn. 1984).  The common definition of hire involves payment for services or use.  Hire means "[t]o procure the temporary use of property, [usually] at a set price," *Black's Law Dictionary* 799 (9ᵗʰ ed. 2009), or "to engage the temporary use of for a fixed sum," *Webster's Third New International Dictionary* 1072 (1993).  With respect to whether a **vehicle** has been hired, courts focus their inquiry on whether an entity has hired the vehicle itself, rather than hiring a driver's services.  *See Canal Ins. Co. v. Great W. Cas. Co.*, Civ. No. 11-772, 2013 WL 5275789, at *9 (D. Minn. Sept. 18, 2013) ("[O]f particular importance to the hiring inquiry is whether the entity could demand a particular vehicle – otherwise courts have concluded that the entity is merely 'hiring' the service and not the 'auto' as required by the language of the insurance policy.").  Borrow, on the other hand, means "[t]o take something for temporary use," *Black's Law Dictionary* 209 or "[t]o obtain or receive (something) on loan with the promise or understanding of returning it or its equivalent," *The American Heritage Dictionary of the English Language* 214 (5ᵗʰ ed. 2011).  "'[B]orrow' differs from 'hire' in that borrowing typically involves no remuneration for use of the article borrowed." *Davis v. Cont'l Ins. Co.*, 656 N.E.2d 1005, 1008 (Ohio Ct. App. 1995).

Defendants argue that ARC did not hire the Truck because, although it paid all expenses related to the Truck, it did not pay Lammert specifically for use of the Truck beyond his general compensation as an employee.  *See Metzger v. Country Mut. Ins Co.*, 986 N.E.2d 756, 762-63 (Ill. Ct. App. 2013) (finding that a company's payments for repairs, gas, insurance, and the loan payments on a truck owned by an employee did not

constitute "a lease or hire" because "there is no evidence that [the company] paid or promised consideration for its use of the [truck]"). The Court will assume for purposes of this motion that a reasonable jury could conclude that none of ARC's payments to Lammert specifically compensated him for ARC's use of the Truck. Even if a jury agreed with Defendants, however, that ARC did not make any payments to Lammert that were specifically tied to its use of the Truck, having made that determination, the only reasonable conclusion that jury could reach is that ARC borrowed the Truck.

In *Metzger*, based on almost identical facts to those presented here, the court found that the company in question borrowed the truck from its employee.[4] In *Metzger* the underlying accident occurred when a truck driven by Brian, the vice president of a masonry company, collided with the plaintiff's car. 986 N.E.2d at 758. Brian sought a determination that the truck was a non-owned vehicle operated in the masonry business. *Id.* at 759. The policy defined a non-owned vehicle as one the masonry company did not "own, lease, hire or borrow" when used in connection with its business. *Id.* at 762. The title to the truck was in Brian's name, but the truck was listed as a business asset on the masonry company's tax forms. *Id.* The company made all loan payments on the truck, as well as paying for repairs, gas, and insurance. *Id.* The truck was used solely in the

---

[4] The Court notes the importance, in conducting the analysis of whether the Truck was hired or borrowed, to recognize that ARC is a legal entity that exists independently of Lammert, although Lammert was ARC's vice president and employee. The analysis of many cases discussing the terms "hire" and "borrow" involves two distinct business entities, *see, e.g.*, *Occidental Fire & Cas. Co. of N.C. v. Westport Ins. Corp.*, Civ. No. 02-8923, 2004 WL 2028616, at * 5 (E.D. Pa. Sept. 10, 2004), and therefore the discussions of control and ownership in those cases can be conceptually difficult to analogize to the scenario presented here where Lammert was essentially acting as ARC. However, "it was analytically and legally possible for [Lammert] in his personal capacity as owner of the truck, to convey possession and use of it to [ARC]." *Metzger*, 986 N.E.2d at 763.

masonry business, and Brian had been on his way to a job site when the accident occurred. *Id.* The masonry company compensated Brian for his work but did not pay Brian specifically for its use of the truck; therefore the court found that the company's use did not constitute "a lease or hire." *Id.* at 763. But the court did find that the truck was borrowed, explaining

> Plaintiff emphasizes that Brian had "sole use of the truck," but ignores the reality that Brian's use of the truck for business was actually the corporation's use of it. . . . Also, though the lending arrangement was, apparently, continuous from the purchase of the [truck] in 2007 to the accident in 2009, Brian retained title to the vehicle, implying that the business was still using it at his pleasure.

*Id.* at 764.

Similarly, here (assuming that ARC made no payments to Lammert specifically for use of the Truck) the undisputed facts demonstrate that ARC was borrowing the Truck from Lammert. Although Lammert retained title to the Truck, ARC consistently received use of that Truck on loan, with the understanding that after it was done being used for the business the Truck would be returned to Lammert's personal possession. This was a borrowing relationship. That this was a borrowing relationship is not altered by the fact that ARC and Lammert never formally agreed that ARC was "borrowing" the Truck. *See Nat'l Interstate Ins. Co. v. Morgan & Sons Weekend Tours, Inc.*, Civ. No. 11-1074, 2013 WL 5430414, at *6 (M.D.N.C. Sept. 27, 2013) (finding that a lack of communication, permission or intention regarding whether a vehicle was borrowed did not preclude the court from finding that the vehicle was borrowed within the meaning of an insurance policy).

Finally Defendants argue that ARC could not have been borrowing the Truck at the time of the accident because ARC used the Truck for all of its business needs, and the relationship between ARC and Lammert with respect to the Truck was not temporary. (*See* Defs. ARC & Lammert's Mem. in Opp'n to Mot. for Summ. J. at 4, Aug. 9, 2013, Docket No. 37 (explaining that use of the Truck does not meet the definition of borrow as "took it 'for temporary use'" because "there was nothing 'temporary' or special about his use of the truck in Aberdeen.  Lammert and ARC had an arrangement whereby Lammert used the truck in all ARC business . . . .").)  But courts considering the scope of similar insurance provisions have concluded that the frequency or duration of an arrangement is irrelevant to whether a vehicle has been borrowed.  *See Am. Indem. Ins. Co. v. Code Elec. Corp.*, 760 P.2d 571, 574 (Ariz. Ct. App. 1988) ("[W]e hold that 'borrowing' does not require an agreement to return the property at a fixed or certain time.  A 'borrowing' may be for an indefinite period and may last until either the borrower decides to return the property or the lender requests its return." (citing *Miller v. Nat'l Farmers Union Prop. & Cas. Co.*, 470 F.2d 700, 705 (8th Cir. 1972))); *Metzger*, 986 N.E.2d at 764 ("[F]requency of use is not determinative – or even pertinent in determining whether a vehicle has been borrowed." (emphasis and internal quotation marks omitted)).  The temporary nature of borrowing referred to in the dictionary definitions of "borrow" does not, as Defendants argue, require that borrowing be a special event or one that occurs only infrequently. Instead, the temporal nature of borrowing as it relates to the present case refers to the fact that there is no permanent change in ownership of the Truck in question.  ARC could "borrow" the Truck for five years, or once a day, every day, or one time for a period of

hours. All of these scenarios describe a temporary state, because at the end of ARC's use, the Truck would return to Lammert's possession. Therefore, the use of "temporary" in defining borrow merely describes a lack of permanence, and does not suggest that borrowing, as characterized by use without ownership, can only be for a short period of time or occur with limited frequency.

Accordingly, the Court finds that if none of the compensation paid to Lammert was specifically for use of the Truck, a reasonable jury could determine only that ARC borrowed the Truck from Lammert. The Court notes that for purposes of this motion it is not required to decide definitively if ARC either hired or borrowed the Truck. In order for summary judgment in State Farm's favor to be appropriate, it is sufficient for the Court to conclude that a jury could not reasonably find that the Truck was a "non-owned auto" under any part of the definition of that term in the Policy.

All of the possible disputed issues of fact identified by Defendants create an issue as to whether the Truck may have been either hired or borrowed, but they create no issue as to whether ARC's use of the Truck falls outside the scope of those definitions. For example, Defendants argue that the Truck was not hired because the compensation paid to Lammert was general compensation for his employment and not related specifically to the Truck. As explained above, if Lammert received no specific compensation for ARC's use of the Truck, those facts would indicate that the Truck was borrowed. Therefore, even if the facts suggest some disagreement about which particular category the Truck falls into – hired or borrowed – the Court concludes that the Truck falls into at least **one** of those categories, thereby precluding coverage under the Policy for damages

arising out of the underlying accident and warranting the entry of summary judgment in State Farm's favor as to coverage for ARC and Lammert.

## IV.    COVERAGE FOR GREAT WEST

Great West argues that, if it is liable for the injuries to De Vaan, it is entitled to insurance coverage under the Policy as an additional insured. Great West admits that its coverage as an additional insured would be barred by the Auto Exclusion, and that coverage is therefore only available to it if the non-owned auto exception applies. As explained above, the non-owned auto exception does not apply to the circumstances of the accident because the Truck was hired or borrowed by ARC. Great West concedes that if the non-owned auto exception is interpreted in the manner explained above that it is not entitled to coverage. In making the argument that it is entitled to coverage, therefore, Great West contends that the Auto Exclusion is **rewritten** when coverage for additional insureds is implicated. Specifically Great West argues that "you" or "your" throughout the Policy refers not just to the named insured – ARC – but also to Great West, which is listed as an additional insured in the Endorsement. Proceeding on this assumption, Great West argues that the non-owned auto exception actually provides coverage for

> bodily injury or property damage arising out of the use of any non-owned auto in [Great West]'s business by any person other than [Great West]

when determining whether Great West is entitled to coverage, rather than

> bodily injury or property damage arising out of the use of any non-owned auto in [ARC]'s business by any person other than [ARC].

Similarly, Great West's assumption would cause the definition of non-owned auto to read "any auto [Great West] does not own, lease, hire or borrow which is used in connection with [Great West's] business."  Tying it all together, Great West argues that the Policy provides it with coverage because the accident arose out of the use of the Truck which Great West did not own, lease, hire or borrow, and at the time of the accident the Truck was being used in Great West's business.

The Court concludes that Great West's reading of the Policy is not a reasonable one, and therefore introduces no ambiguity into the Policy.  *See Carlson*, 749 N.W.2d at 45 (explaining that a policy is ambiguous if its language "is susceptible to two or more **reasonable** interpretations" (emphasis added)).  The Policy explicitly states that "[t]hroughout this policy, the words 'you' and 'your' refer to the **Named Insured shown in the Declarations**."  (Smith Aff., Ex. 1 at 6 (emphasis added).)  Under Minnesota law "all additional insureds are not named insureds."  *Farm Bureau Mut. Ins. Co. v. Weber*, 245 N.W.2d 238, 242 (Minn. 1976).  Accordingly, under the plain language of the Policy "you" and "your" refer only to ARC, the Named Insured shown in the Declarations, not additional insureds, such as Great West, that are later added to the Policy.  The Endorsement making Great West an additional insured did not amend the declarations page listing ARC as the named insured, nor did the Endorsement state that Great West was to be considered a named insured under the Policy.  Instead, the Endorsement stated that "WHO IS AN INSURED, under SECTION II DESIGNATION OF INSURED, is amended to include as an insured the person or organization shown above."  (Smith Aff.,

Ex. 1 at 39.)   Section II is distinct from the declarations page, and none of the other

insureds defined in that section are included as named insureds in the Policy.

Furthermore, the Endorsement specifically listed ARC as the "Named Insured" and did

not include such a designation for Great West.   Finally, Great West has provided no basis

for limiting its reading of "you" and "your" to the non-owned auto exception, and this

interpretation without limitation would lead to absurd results, such as Great West being

liable for premiums due under the Policy.   (*See* Smith Aff., Ex. 1 at 6 ("**You** agree to pay

premiums when due . . . ." (emphasis added)).)

Because "you" and "your" as used in the Policy refer only to the named insured,

the Auto Exclusion is appropriately read as providing coverage for

> bodily injury or property damage arising out of the use of any non-owned
> auto in [ARC]'s business by any person other than [ARC].

As explained above, no such coverage exists with respect to the accident, and therefore

Great West, as an additional insured is similarly entitled to no coverage.   *See Eng'g &*

*Constr. Innovations, Inc.*, 825 N.W.2d at 709 ("Additional insured clauses do not enlarge

the insurance coverage as defined in the policy, but merely cause the insurance to cover

persons other than the named insured within the limits of the policy coverage."

(alterations and internal quotation marks omitted)).   Therefore, the Court will grant State

Farm's motion for summary judgment with respect to Great West.[5]

---

[5] Great West argues at length that before reaching the coverage issues under the Policy, the Court must determine whether Great West can be liable in the underlying lawsuit due to any agency or joint venture relationship between itself and ARC/Lammert.   Specifically, Great West asks the Court to declare that no employer/employee relationship existed between it and Lammert or ARC, and that no joint venture existed arguing that "[t]his coverage action cannot be

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment [Docket No. 34]

is **GRANTED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.


DATED: March 31, 2014                                    _____*John H. Tunheim*_____
at Minneapolis, Minnesota.                                        JOHN R. TUNHEIM
                                                                        United States District Judge

---

resolved until such questions are answered." (Def. Great West's Mem. in Opp'n to Mot. for Summ. J. at 2, 7-17, Aug. 9, 2013, Docket No. 39.)   As explained above, the relationship between Great West and ARC/Lammert is irrelevant to the determination of whether Great West, if liable for the accident, could be covered under the Policy.   Because the questions of an employer/employee or joint venture relationship do not impact the coverage determination sought by State Farm in this declaratory judgment action, the Court will decline to address these issues, as they are better addressed in the underlying state court action related to liability for the accident.   *See Grain Dealers Mut. Ins. Co. v. Cady*, 318 N.W.2d 247, 250 (Minn. 1982) (indicating that in a declaratory judgment action the trial court should determine an issue "unless the issue to be decided is the same as an issue in the main action, or unless its resolution would not terminate the uncertainty or controversy giving rise to the proceeding").